Judges FOX and CANTERBURY, sitting by temporary assignment.

459 S.E.2d 921

**STATE of West Virginia ex rel. BILLY RAY C., Jr., Petitioner,**

v.

**Major General Joseph J. SKAFF, Secretary, West Virginia Department of Military Affairs and Public Safety, Thomas L. Kirk, Deputy Secretary, Department of Military Affairs and Public Safety; and Larry Hite, David Shirlaw and Kelly George, Members of the West Virginia State Board of Risk and Insurance Management, Respondents.**

No. 21894.

Supreme Court of Appeals of West Virginia.

Submitted May 2, 1995.

Decided June 21, 1995.

---

Daniel F. Hedges, Charleston, for Petitioner.

Bradford W. Deel, Asst. Atty. Gen., Charleston, for Dept. of Public Safety.

PER CURIAM:

■ This is a sequel to our opinion in *State ex rel. Billy Ray C. v. Skaff*, 190 W.Va. 504, 438 S.E.2d 847 (1993) (*Skaff I*) in which the relator sought a writ of mandamus to compel the respondents Major General Skaff, as the Secretary of the West Virginia Department of Military Affairs and Public Safety, and Colonel Kirk, the Superintendent of the West Virginia Division of Public Safety, to promulgate formal written investigation procedures to handle complaints of misconduct against state police officers (the respondents). We determined that a writ of mandamus was proper setting out by way of summary our conclusions in Syllabus Point 4:

> Implicit within the Superintendent of the West Virginia Division of Public Safety's mandatory duty to investigate allegations of misconduct under W.Va.Code, 15–2–21 (1977), there is a duty to promulgate formal, written investigation procedures. These procedures should outline (1) how a citizen may notify the Superintendent of alleged misconduct by a State Police officer, and (2) the specific procedure to be followed to ensure that a thorough investigation is conducted by an impartial and neutral party. These procedures also should require that a report of the investigation be given to the Superintendent on which to base his decision.

I

Following our opinion in *Skaff I*, the respondents filed proposed regulations in April 1994. Copies were sent to counsel for the relator who, in June of 1994, made written comments and objections. We permitted respondents to file written comments to relator's objections.

The proposed regulations may be generally summarized as creating an Inspection and Internal Affairs Section (Section) that is "under the command of the agency's Inspector" who reports to the Superintendent. Section 3.00. This Section is composed of trained

investigators.[1] The Inspector receives the initial complaint and assigns it to an investigator with directions as to the procedures to be used. Section 3.03. There are detailed operational procedures covering the conduct of the investigation by an investigator in Sections 7.00 through 7.08. At the conclusion of the investigation, the investigator prepares a case file and written recommendations which are submitted to the Inspector. The Inspector reviews the case file and recommendations, then makes his own recommendation to the Superintendent who, under *W.Va.Code*, 15–2–21 (1977), is charged with making the final determination.

Relator made six objections to the proposed regulations filed on behalf of the Department of Public Safety.[2] This Court concluded that it lacked the expertise to fully evaluate the proposed regulations and the objections made to them. Consequently, we obtained the services of Professor James J. Fyke, Ph.D. of the Department of Criminal Justice at Temple University to review the Department's proposed regulations and the various comments that had been received from the parties. Thereafter, in January of 1995, we received a written report from Professor Fyke. Copies of his report were transmitted to the parties by an Order entered on January 6, 1995, with the request that they file responses to the report by March 1, 1995. This matter was reset for argument on May 2, 1995.

Professor Fyke's report raised a new issue that the relator now adopts; that the proposed internal investigation regulations are inherently defective. It is recommended that there be a civilian police advisory committee that should review complaints against members of the department of public safety. The basis for this recommendation is that this would enhance the public perception that an unbiased tribunal was handling misconduct and abuse charges.

The exact structure of this type of procedure is not set out. Even the general role of the civilian committee is not stated as to whether it would investigate the complaint initially, or use investigators and then act as a decision panel. We are also not informed as to whether the civilian panel's decision is final or subject to ultimate review by the Superintendent. As we explained in *Skaff I*, under *W.Va.Code*, 15–2–21 (1977), the Legislature has reposed the ultimate decision as to disciplinary matters in the office of the Superintendent of the Department of Public Safety.

 We decline to require a civilian review panel for several reasons. First, in view of the ultimate decision having to be made by the Superintendent, it would seem that civilian input into the process would not ultimately satisfy a complainant who has received an adverse ruling from the Superintendent. A second and more compelling reason is that from a legal standpoint, we have

1. The Superintendent states in his April 4, 1994 Response which accompanied the proposed regulations that:

 Twenty-one troopers recently attended and successfully completed a basic internal affairs investigation training program. The course was taught at the State Police Academy by representatives of the Institute of Police Technology and Management of North Florida University, at Jacksonville, Florida. The goal of the training was to enhance the Division's ability to investigate all complaints and personnel problems in a competent, neutral and timely manner....

 Two Division officers have completed an Advanced Proactive Internal Affairs course conducted by the International Chiefs of Police Association. The course focused on current case law and the implementation of internal management systems aimed at identifying personnel problems before they manifest themselves as inappropriate on or off-duty behavior.

2. The relator's six objections to the regulations proposed by the Superintendent are summarized as follows:

 1) Reliance on a group of troopers to conduct employee investigations rather than one or two full time investigators (Section 3.0).

 2) Routine use of polygraph on the complaint. (Section 7.2).

 3) Informing complainant that the law makes it a misdemeanor to give false information to a state police officer. (Section 7.2).

 4) Lack of details in annual report summary. (Section 3.04).

 5) Lack of mandatory trooper incident report where observable injury to another has occurred.

 6) Lack of public access to reports of investigations.

traditionally stated that while mandamus is an appropriate remedy to require public officials to perform their prescribed duties, it is not available to prescribe in what particular manner they shall act as illustrated by Syllabus Point 3 of *Anderson v. Richardson,* 191 W.Va. 488, 446 S.E.2d 710 (1994):

> Mandamus is a proper remedy to compel tribunals and officers exercising discretionary and judicial powers to act, when they refuse so to do, in violation of their duty, but it is never employed to prescribe in what manner they shall act, or to correct errors they have made. Syl. pt. 1, *State ex rel. Buxton v. O'Brien,* 97 W.Va. 343, 125 S.E. 154 (1924). Syl. pt. 2, *State ex rel Lambert v. Cortellessi,* 182 W.Va. 142, 386 S.E.2d 640 (1989). Syllabus, *Ney v. West Virginia Workers' Compensation Fund,*

186 W.Va. 180, 411 S.E.2d 699 (1991). Syllabus Point 6, *Lyons v. Richardson,* 189 W.Va. 157, 429 S.E.2d 44 (1993).

We initially issued the mandamus in *Skaff I* because we found that *W.Va.Code,* 15-2-21 (1977) provided a basis for requiring rules and regulations for handling complaints against members of the department of public safety. The argument now advanced for a civilian oversight panel is an effort to have us prescribe details of the type of system that must be used.[3] This we decline to do.

Finally, respondents point out that the standards, adopted by the Commission on Accreditation for Law Enforcement Agencies, Inc., do not mandate a civilian review panel in its section on Internal Affairs.[4]

When we turn to the original six objections made by the relator, we find that some of

---

**3.** We have recognized that mandamus can be brought to control what may be termed discretionary acts if it can be shown that the public official or agency was acting contrary to law or the conduct was fraudulent. See Syllabus Point 1 *Pell v. Board of Education of Monroe County,* 188 W.Va. 718, 426 S.E.2d 510 (1992).

**4.** Section 52 of the Standards deals with the structure of an Internal Affairs section as follows. The designation (M) is for a mandatory provision and (O) indicates it is optional.

**52.1 Administration**
**52.1.1** A written directive establishes the agency's internal affairs function. (M)
**52.1.2** Deleted as of November 20, 1992.
**52.1.3** A written directive specifies the activities of the internal affairs function, to include: (i) recording, registering, and controlling the investigation of complaints against officers; (ii) supervising and controlling the investigation of alleged or suspected misconduct within the agency; and (iii) maintaining the confidentiality of the internal affairs investigation and records. (M)
**52.1.4** A written directive specifies the categories of complaints that require investigation by the internal affairs function. (M)
**52.1.5** A written directive specifies a position in the agency responsible for the internal affairs function with the authority to report directly to the agency's chief executive officer. (M)
**52.1.6** Written directives relating to the administration of the internal affairs function are disseminated to all personnel. (M)
**52.1.7** When employees are notified that they have become the subject of an internal affairs investigation, the agency issues the employee a written statement of the allegations and the employee's rights and responsibilities relative to the investigation. (M)
**52.2 Complaint Processing**
**52.2.1** A written directive requires the agency to investigate all complaints against the agency or employees of the agency. (M)
**52.2.2** A written directive requires the agency to maintain a record of all complaints against the agency or its employees. (M)
**52.2.3** The agency provides written verification to complainants that the complaint has been received for processing. (O)
**52.2.4** The agency disseminates information to the public on procedures to be followed in registering complaints against the agency or its employees. (O)
**52.2.5** A written directive requires that the agency notify the complainant concerning the status of complaints against the agency or its employees. (O)
**52.2.6** A written directive specifies the procedures for notifying the agency's chief executive officer of complaints against the agency or its employees. (O)
**52.2.7** Records pertaining to internal affairs investigations are maintained in a secure area by the individual responsible for the internal affairs function. (O)
**52.2.8** The agency publishes annual statistical summaries, based on the records of internal affairs investigations, for dissemination to the public and to agency employees. (O)
**52.3 Operational Procedures**
**52.3.1** The agency maintains liaison with the prosecutor's office in investigations involving alleged criminal conduct on the part of an employee. (O)
**52.3.2** A written directive defines the type of complaints to be investigated by line supervi-

them are resolved in the June 17, 1994 Response of the Superintendent. As to the first objection, relating to the lack of a small group of full time investigators, it is pointed out that the twenty-one trained investigators are a preliminary measure. They are to be considered as a pool from which the "Division intends to select ... a contingent of three to five investigators to staff the Inspection and Internal Affairs Section on an exclusive, full-time basis." We accept this representation and find that it satisfies the relator's first objection.

The relator's second objection on the use of a polygraph in the investigation of complaints is not well-founded. First, the proposed regulations make it clear that use of polygraph examinations is limited "... to those cases in which the allegations are relatively serious and all other investigative leads have failed to produce a preponderance of evidence which will either prove or disprove the allegations." Section 8.08. Moreover, under Section 8.08(3), the "... complainant [can] refuse ... to take the examination...."

■ The third objection is to the provision in Section 5.06 requiring that, at the time the initial written complaint is taken by a state police officer, the complainant is to be advised that it is a violation of *W.Va.Code*, 15–2–16 (1977) to provide false information.[5] The relator claims that this will intimidate persons from making complaints. However, we do not agree as this provision is nothing more than a statement of existing law.

The fourth objection by the relator deals with the lack of a thorough annual report. However, this claim is based on the general language of Section 3.04 which merely requires that "The Inspector shall prepare an annual statistical report." The respondents point out that *W.Va.Code*, 15–2–23 (1977) authorizes an annual report, and that this annual report "is a matter of public record ... and contains ... a detailed synopsis of every facet of activities within the Inspection and Internal Affairs Section, including but not limited to data on complaints filed, investigations, dispositions, and discipline." A copy of an annual report has been furnished and we find that it is adequate.

The fifth objection was that there are no incident report forms to report injuries to others. The respondents dispute this claim by pointing to Section 9.00 and accompanying Exhibits H and I attached to the proposed regulations. These are forms for reporting any use of force by state police. Consequently, we find no merit as to this objection.

The final objection relates to public access to various internal documents generated in investigation of complaints. We decline to address this general claim as obviously, this issue would be controlled by the West Virginia Freedom of Information Act, *W.Va.Code*, 29B–1–1, *et seq.* (1977), and we decline to give any general advisory opinion in this area.

sors that are to be reviewed by the agency's internal affairs function. (O)

52.3.3 A written directive specifies the circumstances in which an employee may be relieved from duty. (O)

52.3.4 A written directive specifies the conditions, if any, under which instruments for the detection of deception are used in conducting internal affairs investigations. (O)

52.3.5 A written directive specifies the conditions under which:
(i) medical or laboratory examinations are administered in conducting internal affairs investigations; (ii) photographs are taken of employees in conducting internal affairs investigations; (iii) an employee may be directed to participate in a line-up as part of an internal affairs investigation; and (iv) an employee may be required to submit financial disclosure

statements as part of an internal affairs investigation. (O)

52.3.6 A written directive specifies a 30–day time limit for completing an internal affairs investigation, with status reports due every seven days. (O)

5. *W.Va.Code*, 15–2–16 (1977) states, in relevant part:

Any person who shall at any time ... who knowingly gives false or misleading information to a member of the department, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county jail for not more than sixty days, or both fined and imprisoned.

We note that during the course of oral argument, the attorney representing the respondents acknowledged that its brochure regarding the filing of complaints was misleading, as to the requirements for taking a polygraph examination, because it did not comport with its Section 8.08. The same problem existed as to its language regarding the filing of a false complaint. We were advised that new brochures were being prepared to correct these deficiencies. We accept this representation.

■ Finally, we address the question of which type of rules should be published. The proposed regulations which have been referred to in this opinion are quite detailed. It appears that the Superintendent, rather than publish these regulations under The Administrative Procedure Act, *W.Va.Code*, 29A–3–1, *et seq.* (1988) (Act), proposes to publish a brief synopsis of the proposed regulations, some of which may be misleading.[6] We believe that *W.Va.Code*, 29A–3–2 (1982) dealing with what must be published under the Act [7], when read in conjunction with the definition of "Rule" contained in *W.Va.Code*, 29A–1–2(i) (1982),[8] requires that the full proposed regulations need to be published in accordance with the procedures set out in the Act. *See generally West Virginia Chiropractic Society, Inc. v. Merritt*, 178 W.Va. 173, 358 S.E.2d 432 (1987).

## II

■ In addition, the relator had sought mandamus against the members of the West Virginia State Board of Risk and Insurance Management (Board) to require it to adopt regulations to identify police misconduct claims because they would have an impact on the State's liability insurance which is supervised by the Board. This request was also granted as summarized in Syllabus Point 5 of *Skaff I*:

Under W.Va.Code, 29A–12–5 (1986), which delegates to the West Virginia State Board of Risk and Insurance Management the authority to investigate and settle claims under the State's liability insurance, the Board of Risk is required to promulgate rules or regulations for State agencies covered by the State's liability insurance policy that will enable the Board to promptly identify potential liability claims against the State.

The relator's chief complaint to the regulations is that the term "incident" as defined in its proposed rule is too narrow [9] and should be broadened as follows:

There is no applicable exemption for the proposed rules.

6. For example the proposed draft to be filed as Legislative Rules contains in Rule 7.1 only a brief statement relating to the use of polygraphs that the "complainant may be asked to submit to a polygraph examination ..." whereas the detailed regulations clearly indicate that polygraph examinations are limited under Section 8.08 and may be refused under 8.08(3).

7. *W.Va.Code*, 29A–3–2 (1982) states in relevant part:

(a) Except when, and to the extent, that this chapter or any other provision of law now or hereafter made expressly exempts an agency, or a particular grant of the rule-making power, form the provisions of this article, every grant of rule-making authority to an executive or administrative officer, office or agency, heretofore provided, shall be construed and applied to be effective only:

(1) If heretofore lawfully exercised in accordance with the prior provisions of this chapter and the resulting rule has not been revoked or invalidated by the provisions hereof or by the agency; or

(2) If exercised in accordance with the provisions hereof.

8. *W.Va.Code*, 29A–1–2(i) (1982) states:

(i) "Rule" includes every regulation, standard or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, affecting private rights, privileges or interests, or the procedures available to the public, adopted by an agency to implement, extend, apply, interpret or make specific the law enforced or administered by it or to govern its organization or procedure, but does not include regulations relating solely to the internal management of the agency, nor regulations of which notice is customarily given to the public by markers or signs, nor mere instructions. Every rule shall be classified as "legislative rule," "interpretive rule" or "procedural rule," all as defined in this section, and shall be effective only as provided in this chapter....

9. The Board's proposed definition of "incident" was:

3.4—"Incident" means any activity either observed by an "Employee" or made known to

3.4: Incident means any activity, whether participated in by an employee, observed by an employee, or made known to an employee, and whether intentional or unintentional, which has or might have resulted in physical or property damage to another or to another's property and which has the potential for resulting in a claim against the State of West Virginia for damages.

During the course of oral argument the attorney for the Board agreed to accept the relator's proposed definitions of the term "risk".[10] We accept this representation.

For the foregoing reasons, and subject to the representations made by the various parties, we conclude that the regulations proposed by the respondents and the Board are acceptable.

Writ granted as moulded.

BROTHERTON and RECHT, Justices, did not participate.

CLECKLEY, Justice, deeming himself disqualified, did not participate.

MILLER, Justice (Retired), and FOX and RANSON, JJ., sitting by temporary assignment.

---

him or her, which has or may have resulted in physical or property damage to a third party or to his or her property and which has the potential of resulting in a claim against the State of West Virginia for damages.

10. The relator also claimed that the three (3) year retention period for the initial reporting form is insufficient. However, this particular section states "three (3) years or longer". Moreover, this term is merely for the initial reporting forms. It is contemplated that a further investigation will be made.