657 S.E.2d 176

STATE of West Virginia ex rel. REGION-
AL JAIL AND CORRECTIONAL FA-
CILITY AUTHORITY, Petitioner Be-
low, Appellant

v.

COUNTY COMMISSION OF CABELL
COUNTY, Bob Bailey, as President; W.
Scott Bias, as Commissioner; and Nan-
cy Cartmill, as Commissioner, Respon-
dents Below, Appellees.

No. 33347.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 10, 2007.

Decided Nov. 21, 2007.

Concurring Opinion of Justice Starcher
November 21, 2007.

Gary E. Pullin, J. Robert Russell, Pullin Fowler & Flanagan, P.L.L.C., Chad M. Cardinal, Charleston, WV, for Appellant.

Ancil G. Ramey, Hannah B. Curry, Steptoe & Johnson, P.L.L.C., Charleston, WV, William T. Watson, Huntington, WV, for Appellees.

ALBRIGHT, Justice.

In this original mandamus action,[1] the West Virginia Regional Jail and Correctional Authority ("Authority") seeks to compel the County Commission of Cabell County ("Commission") to fulfill its obligation to pay for the care and upkeep of those persons incarcerated in the West Virginia Western Regional Jail at the express direction of Cabell County authorities. When the petition was initially filed, the arrearage owed by the Commission was allegedly in excess of 1.5 million dollars with respect to fiscal year 2005.[2] Upon this Court's issuance of a rule to show cause before the Circuit Court of Cabell County, discovery ensued in this matter. By order entered on May 15, 2006, the trial court granted the Authority partial summary judgment and ruled that the Commission was liable to the Authority for per diem charges assessed in connection with inmates housed at the Western Regional Jail adjusted in accordance with the trial court's findings of fact and conclusions of law. Upon our consideration of the Authority's appeal from the trial court's ruling, we issue a moulded writ of mandamus as set forth below.

## I. Factual and Procedural Background

In 1982, under the auspices of the Governor's Committee on Crime, Delinquency, and Corrections, a special study called for the establishment of a regional jail system to address the problems associated with the operation of individual county jails. In response to this study, the Legislature created the West Virginia Regional Jail and Prison Authority (now known as the West Virginia Regional Jail and Correctional Facility Au-

---

1. The West Virginia Regional Jail and Correctional Authority initiated this matter as a petition for a writ of mandamus on June 15, 2005, pursuant to this Court's original jurisdiction. *See* *W.Va Const.*, art. VIII, § 3; *see also* W.Va.Code § 31–20–5(g) (1998) (granting Authority power to sue in any court). We returned a rule to show cause to the Circuit Court of Cabell County for the purpose of taking sufficient discovery to permit the matter to be fully addressed, which culminated in the issuance of a partial grant of summary judgment to the Authority by order dated May 15, 2006. As discussed in the text of this opinion, this Court elects to treat this matter in the same procedural posture (mandamus) as when it was originally filed with this Court, given the statewide affect of this decision and the public interests at stake in this case.

2. According to the Stipulation entered into by the parties and filed with the trial court on March 31, 2006, the arrearage owed by the Commission was reduced to $457,355.00 for fiscal year 2005 based on additional payments made during the pendency of this proceeding.

thority) through legislation known as the West Virginia Regional Jail and Correctional Facility Authority Act ("Act"). *See* W.Va. Code §§ 31–20–1 to –32 (1985) (Supp.2007). Pursuant to the Act, the Legislature placed priority upon the development of regional jails and developed a mechanism by which such correctional facilities could be constructed, maintained, and operated in a cost-efficient manner.[3]

Under the Act, construction costs for the regional jail system are borne through the issuance of bonds, paid primarily by fees related to convictions for criminal violations. *See* W.Va.Code § 7–5–15 (2001), § 8–11–1(d) (1998). Operational costs for the regional jail system are borne by the entities housing inmates in the facilities, the bulk of which is paid for by county governments. *See* W.Va. Code §§ 31–20–10, 31–20–10a; W.Va.R. *Regional Jail and Correctional Facility Authority Procedural Rule*, § 94–3–5.2 (1995) (stating that "[t]he Authority shall collect the cost per inmate day from each entity for which an inmate is maintained in a regional jail"). The cost per day to house inmates, known as the "per diem rate," is set pursuant to West Virginia Code § 31–20–10(h) and regulations promulgated pursuant to the statute. *See* W.Va.R. § 94–3–5.

At the time when the Western Regional Jail opened on December 13, 2003, the per diem rate set by the Authority was $45.00. On February 10, 2004, the Authority, through its Board, voted to raise the per diem rate to $48.50. The events that precipitated the filing of this proceeding include a string of serious budget setbacks suffered by Cabell County,[4] which led to the Commission's decision to significantly reduce the figure budgeted for its regional jail fee payments for fiscal year 2005.[5] As a result, the Commission quickly fell in arrears with regard to its payments to the Authority. In an attempt to force the Commission to pay its statutorily required per diem fees, the Authority filed a mandamus action with this Court on June 15, 2005. By order entered on July 8, 2005, this Court issued a rule returnable before the Circuit Court of Cabell County "for such further proceedings as necessary to determine the issues presented."

Following discovery and the filing of cross motions for summary judgment, the trial court entered an order on May 15, 2006, through which it ruled that the Commission was liable to the Authority for unpaid per diem charges for fiscal year 2005 based on a rate of $40.42[6] for every inmate day charged to the Commission from and after July 1, 2004.[7] Before *sua sponte* directing a reduction in the per diem rate from $48.50 to $40.42, the trial court decided that certain

---

**3.** To date, ten such regional jails have been constructed.

**4.** A separate lawsuit was filed against the Commission by the Cabell County Prosecutor, Circuit Clerk, County Clerk, Assessor, and Sheriff, when the Commission approved a budget on March 2, 2005, wherein the budgets for many of the county offices were significantly reduced in an effort to meet Cabell County's projected obligation to the Authority. As a result of that lawsuit, a writ of mandamus and a permanent injunction were entered by the Circuit Court of Cabell County on March 23, 2005, prohibiting the Commission from proceeding with the budget resolution passed on March 2, 2005, based on the operational impediments constitutional officers would experience due to such cuts. In addition, the Commission was directed to address its budget problems pursuant to the following priorities: "[A] county must first fully fund all of its constitutional obligations and, thereafter, if additional funds remain, fund so much of its statutory obligations as possible and, thereafter, if additional funds remain, fund so much of its contractual

obligations as possible." *Chiles v. Bailey*, No. 05–C–162, 2005 WL 5480432 (Cir. Ct. Cabell Co. March 22, 2005).

**5.** To illustrate, in fiscal year 2003–2004, the Commission budgeted $1,635,839 for regional jail fees and yet for fiscal year 2004–2005, the budgeted amount was only $1,089,322 for the same fees.

**6.** The rate of $40.42 was a figure stipulated to result from dividing the actual operating expenses for the Western Regional Jail by the actual number of inmate days. According to the stipulation, the per diem rate calculation that resulted by applying the formula outlined in W.Va.R. § 94–3–1 was $55.22, based on dividing the actual operating expenses by bed capacity.

**7.** The trial court provided for an increase of that rate through use of a temporary surcharge if the actual operational costs per inmate day of the Western Regional Jail exceed $40.42 by more than ten percent. *See* W.Va.Code § 31–20–10a(2).

procedural infirmities prevented the rate increase approved at the February 10, 2004, meeting of the Authority's governing board from being valid.[8] In addition, the trial court ruled that the procedural rule pursuant to which the Authority had previously calculated the per diem rate was invalid based on statutory amendments adopted in 1998 requiring the adoption of a legislative rule. *See* W.Va.Code § 31–20–10(h) (1998). In refusing to issue the writ of mandamus requested by the Authority, and while determining that it was without authority to direct the Commission to act in a particular manner with regard to the exercise of its budgetary authority, the trial court nonetheless cited its recent pronouncement in the *Chiles v. Bailey* decision in which it set forth the priority schedule that a county with insufficient funds should adopt in seeking to fund its obligations: (1) constitutional; (2) statutory; and (3) contractual. *See supra* n. 4.

Through its appeal to this Court, the Authority seeks relief from the ruling of the trial court on three separate grounds. First, the Authority argues that the trial court erred in failing to issue a writ of mandamus requiring the Commission to remunerate it for per diem charges already assessed and currently owed. Second, the Authority contends that the trial court erred in ruling that the Authority could only charge the Commission for the "actual cost" of housing each individual, instead of utilizing the criteria and procedures set forth in a procedural rule to arrive at the per diem rate.[9] *See* W.Va.R. § 94–3–1. Finally, the Authority maintains that the trial court erred in concluding that the Authority improperly enacted an increase in the per diem rate at its February 10, 2004, meeting.

## II. Standard of Review

 As we recognized in *Arneault v. Arneault,* 216 W.Va. 215, 605 S.E.2d 590

(2004), a *de novo* standard of review applies to a circuit court's decision to grant or deny a writ of mandamus. *Id.* at 217, 605 S.E.2d at 592 (citing *McComas v. Board of Educ. of Fayette County,* 197 W.Va. 188, 193, 475 S.E.2d 280, 285 (1996)). As to whether a writ of mandamus should issue in connection with this case, the controlling standard is set forth in syllabus point two of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969): "A writ of mandamus will not issue unless three elements coexist— (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." With these standards in mind, we proceed to examine the rulings of the circuit court and to determine whether a writ should issue.

## III. Discussion

### A. Original Jurisdiction

As an initial matter, we wish to address the Court's decision to treat this matter now before the Court as one of original jurisdiction, rather than an appeal, in light of our having issued the rule to show cause returnable to the Circuit Court of Cabell County. It has been the historic practice of this Court and indeed the appellate rules of procedure specifically provide for this Court to refer matters in need of factual development to a special master or commissioner. *See* W.Va. App.Pro.R. 14(f). In some cases presented to this Court under our original jurisdiction, we have issued a rule returnable to a lower court for the express purpose of determining whether an extraordinary writ should issue. *See, e.g., Nobles v. Duncil,* 202 W.Va. 523, 505 S.E.2d 442 (1998). In this case, the undeveloped record compelled this Court to

8. Those procedural issues center on the issue of whether a quorum was present at the meeting in which the rate increase was adopted due to the telephonic participation by one board member as well as the question of whether another individual who attended by "proxy," was in fact the statutorily permitted designated representative of one of the board members. *See* W.Va.Code § 31–20–3.

9. The Authority observes: "The only reason that the parties were able to calculate the *actual costs* for the circuit court in this case is that the issue did not reach the court until after the fiscal year [2005] had ended." As the Authority further posits, the realities of operating the regional jail system will not permit "waiting until the end of a fiscal year to assess each county and then waiting the attendant amount of time to receive reimbursement...."

issue the rule returnable to the Circuit Court of Cabell County to permit both discovery and additional related proceedings that would enable a factfinder to issue rulings on the issues presented.

■ Admittedly, the typical procedural manner in which this Court considers the rulings of a trial court to whom a case was either referred or in which a rule was directly returned is pursuant to standards related to appeal. *See id.* at 528, 505 S.E.2d at 447. This case, however, demonstrates a need to recognize that in matters having statewide impact and affecting the public interest that are filed with the West Virginia Supreme Court as a petition for mandamus but returned to a circuit court for full development, upon appeal of the lower court's order, we may elect pursuant to Rule 2 of the West Virginia Rules of Appellate Procedure to suspend our usual practice of remanding with directions and grant relief through a writ issued by this Court. As will be further developed below, the facts of this case present a compelling basis for directly issuing a moulded writ of mandamus rather than remanding this matter to the trial court with directions to do the same.[10] Accordingly, we will treat this case as it was initially filed with this Court—as a petition seeking a writ of mandamus pursuant to our grant of original jurisdiction. *See W. Va. Const.* art. VIII, § 3.

### B. Grounds for Relief Requested

In seeking a writ of mandamus from this Court, the Authority argues that this case presents an urgent matter of public policy given that the structure of the regional jail system is dependent upon payments from all counties using the system to cover the costs of inmate care and housing. *See* W.Va.Code § 31-20-10(h). Because the legislative schema which underlies the regional jail system requires that all entities housing inmates within the regional jails must fulfill their payment obligations, the Authority contends that the failure of a large county such as Cabell to make its per diem payments "can only result in either unacceptably higher levels of cost, lower levels of service, or the eventual collapse of a well thought out cost efficient system." Seeking to elevate the Commission's statutory duty to make per diem rate payments to a constitutional level, the Authority suggests that "[t]he care and maintenance of inmates is a constitutionally required function of county government."[11]

Responding to the Authority's attempt to color its statutory payment duties as constitutional in nature, the Commission points out that prior to the Act's adoption the counties clearly had a constitutional obligation to maintain the jails they operated in a manner that complied with recognized prohibitions against cruel and inhuman treatment. Once the Authority assumed the obligation to maintain the regional jail system, however, the responsibility for meeting constitutional standards pertaining to inmates was firmly imposed on the Authority rather than the Commission. In support of its position, the Commission cites to this Court's decision in *Kenny v. Webster County Court,* 124 W.Va. 519, 21 S.E.2d 385 (1942), in which we recognized that "the power of the county courts, in the superintendence and administration of the internal police and fiscal affairs of their counties has, from the very beginning of our statehood, been controlled and restricted by legislative authority...." *Id.* at 526, 21

---

**10.** Illustrative of the need for a ruling directly from this Court is the decision of at least six county commissions to unilaterally reduce the amount of their per diem payments to the Authority based on the ruling of the circuit court, a ruling that was limited in scope to payments owed by the Commission to the Authority for the Western Regional Jail for fiscal year 2005. In its brief to this Court, the Authority represents that per diem payment reductions have been taken by Lincoln, Mingo, Wayne, Fayette, Harrison, and Taylor Counties, all by citing to the May 15, 2006, order issued by the trial court in this case.

**11.** To support this contention, the Authority looks to the obligation imposed on county forms of government to administer both police and fiscal affairs. *See W. Va. Const.* art. IX, § 11. Further, the Authority suggests that the need to provide certain minimum standards of conduct for both pretrial detainees and inmates compels the conclusion that the obligation of counties to make per diem rate payments should be treated as more than merely a statutory obligation. *See U.S. Const.* amends. VIII, XIV.

S.E.2d at 388.[12] Adamant in its contention that the legal obligation of the counties to the Authority is statutorily and not constitutionally based, the Commission cites the language of West Virginia Code § 31–20–10a(c), which provides that "[t]he county is responsible for costs incurred by the Authority for housing and maintaining inmates in its facilities who have not been committed to the custody of the Commissioner of Corrections."[13]

## 1. Clear Legal Right and Duty

■ Against these arguments, we proceed to examine whether there is a clear legal right in the relief sought by the Authority (assessed per diem payments) and whether there is a concomitant legal duty on the part of the Commission to make the payments that are at issue in this case. *See Kucera,* 153 W.Va. at 539, 170 S.E.2d at 367, syl. pt. 2. Necessary to our analysis is a recognition that the Legislature undisputedly has the power to create a regional jail system. *See generally* W.Va.Code §§ 31–20–1 to 31–20–32. And, as part of the regional jail schema, the Legislature has the power to require the counties to use such regional jails in lieu of the previous system of county jails. *See* W.Va.Code § 31–20–10(g) (requiring counties to use regional jails to house inmates upon construction). Under the statutory scheme adopted in creating the regional jail system, the Legislature was acting within its powers in establishing a system of remuneration whereby counties that incarcerate individuals within the regional jails are obligated to remit to the Authority a reasonable per diem rate for costs associated with the housing of such inmates. *See id.* at § 31–20–10(h) (providing for payment by counties to Authority for per diem costs for each incarcerated inmate).

■ Continuing in this same vein, we recognize that the Legislature was acting within its powers in delegating to the Authority the duty to set a reasonable per diem rate in connection with the costs associated with inmates housed at the regional jails. *See* W.Va.Code § 31–20–10(g). And, as part of this appropriate delegation of duties, the Legislature could further require the Authority to promulgate rules for the purpose of identifying the criteria and procedures necessary for setting the reasonable per diem rate. *See id.* at § 31–20–10(h) (providing initially in 1985 for promulgation of procedural rules and in 1998, expressly calling for legislative rules).

■ Pursuant to the original legislative enactment, only a procedural rule was required for the purpose of delineating the criteria and procedures related to setting the per diem rate charge, which was originally known as the cost per inmate day. *See* W.Va.Code § 31–20–10(h) (1985). In accordance with that statutory directive, certain procedural rules were adopted which remain in place today and upon which the Authority apparently continues to rely to set the per diem rate charges. *See* W.Va.R. § 94–3–5 (setting forth provisions for calculating cost per inmate day).[14] In ruling on this matter below, the trial court decided that the failure

---

12. Additionally, the Commission notes that it is the Authority who is now named as a party in any lawsuit brought by inmates raising constitutional claims. *See, e.g., Sutphin v. Reg'l Jail Auth.,* No. 2:10–0588 (S.D.W.Va.).

13. Because this statutory provision did not go into effect until July 1, 2004, we continue to rely on West Virginia Code § 31–20–10(h) as the statutory provision that initially imposed a duty upon the counties to pay the Authority for inmate related costs. However, West Virginia Code § 31–20–10a(c) clearly provides additional authority for the payment obligation imposed on the counties who incarcerate inmates at the regional jails.

14. Under this procedural rule the general methodology by which the inmate cost per day is determined is as follows: "The Authority shall sum the operational costs of each regional jail and shall divide the total of such anticipated operational expenditures by the total anticipated number of inmate days in each of the regional jails to yield the cost per inmate day as the quotient." W.Va.R. § 94–3–5.1. Additionally, the procedural rule provides a formula for determining the anticipated number of inmate days in a fiscal year (product of bed capacity of regional jail multiplied by capacity factor of ninety percent multiplied by number of days in fiscal year). W.Va.R. § 94–3–5.1.2. With regard to five of the ten regional jails, the procedural rule expressly identifies the bed capacity for those facilities (i.e. Eastern, Central, South Central, Northern, and Southern). *Id.*

of the Authority to promulgate legislative rules for the purpose of setting forth criteria and procedures for setting the per diem rates as required by statutory amendments enacted in 1998 rendered the procedural rules invalid. *See* W.Va.Code § 31–20–10(h) (1998).

There is no question that when the procedural rules at issue were adopted, the rules resulted pursuant to a valid exercise of the properly delegated powers of rule making granted to the Authority by the Legislature. Under the reasoning employed by the trial court, once there was a statutory obligation to create a legislative rule, the procedural rule was necessarily deprived of validity. While we certainly recognize that the Authority has yet to fulfill its duty to comply with the statutory directive of adopting a legislative rule to replace the previously adopted procedural rule with regard to the manner in which the per diem rates are set, we do not reach the conclusion that the procedural rules lacked effect, either upon the initial adoption of the statutory amendments in 1998 or currently when, despite the passage of nine years, the legislative rule has yet to be promulgated and adopted. *See* W.Va.Code § 31–20–10(h) (1998).

The unfortunate result that has occurred, either because of the apparent failure of the Legislature or its oversight committee to force the Authority to comply with its statutory directive to adopt a legislative rule, is that the Authority has been permitted to continue operating the regional jails with essentially no legislative review as to the rate setting issue. Because we do not discern any intent on the Legislature's part to repeal the validly adopted procedural rule that was governing the rate setting methodology before the 1998 amendments, we are reluctant to adopt the trial court's position to essentially "throw out the baby with the bath water." Due to the normal passage of time required for drafting, promulgating, and adopting legislative rules, there would have been a period

of time after the adoption of the statutory directive in 1998 during which the procedural rule necessarily had to remain in force. Obviously, the Legislature would have anticipated the rule making process mandated by West Virginia Code § 31–20–10(h) to have been finalized by now. But the fact that it has not yet been accomplished does not convince this Court that the procedural rule previously adopted is wholly without effect. We are inclined to conclude that as a validly adopted procedural rule, the rule remains in effect until either withdrawn, repealed, or replaced as a result of action taken by the Legislature or pursuant to the rule making power of the Authority.

Notwithstanding the continuing validity of the procedural rule, we recognize the existence of several consequential problems that have arisen by the inaction at issue. First, and foremost, is the fact that any modifications that the Authority seeks to implement in connection with the criteria and procedures relied upon for establishing the per diem rate charges are valid only if they are effected pursuant to legislative rule. *See* W.Va.Code § 31–20–10(h). With the passage of statutory amendments in 2004, the Act contains language which arguably indicates that the Legislature contemplates that the per diem rate charges shall be calculated separately for each respective regional jail. *See, e.g.,* W.Va.Code § 31–20–10a. Currently, each county's assessments for regional jail usage is calculated pursuant to the same per diem rate structure. As this matter has demonstrated, even the application of the criteria and procedures originally set in place by procedural rule is not without dispute.[15] Another serious issue that has developed due to the failure to adopt a legislative rule for rate setting purposes is that the Authority has been deprived of guidance on how to proceed with setting the per diem rate structure and the Legislature and the counties have been denied the opportunity to participate in the rule making process that was

---

**15.** One disputed issue that needs to be addressed as far as setting the per diem rate charges concerns the use of a facility's rated bed capacity versus the historical occupancy of the particular regional jail. While the procedural rule contemplates the use of a rated bed capacity, the Author-

ity has apparently been using historical occupancy rates instead for rate setting purposes. And as a result, the Commission notes that this manner of rate assessment has actually resulted in a surplus of funds to the Authority.

clearly envisioned as part of the 1998 amendments to West Virginia Code § 31–20–10(h).

## 2. Mandamus Relief for Rule Promulgation

■ This Court has previously been asked to rule upon the critical absence of rules and regulations in the context of a mandamus proceeding. In *State ex. rel. Billy Ray C. v. Skaff*, 190 W.Va. 504, 438 S.E.2d 847 (1993), the relator, a minor alleging police brutality, sought the issuance of a writ of mandamus against the Secretary of the Department of Military Affairs and Public Safety and the Superintendent of the Division of Public Safety to create an impartial procedure for investigating allegations of alleged abuse committed by police officers and to compel the Board of Risk and Insurance Management to issue rules and regulations requiring the issuance of incident reports when the state's liability is implicated. In discussing the right of the relator to bring allegations of abuse by a state police officer to the attention of the superintendent of public safety, we observed that the first prong of entitlement to relief under the standard set forth in *Kucera* (clear legal right to relief sought) " 'is generally a question of standing.' " 190 W.Va. at 507, 438 S.E.2d at 850 (quoting *Smith v. W.Va. State Bd. of Educ.*, 170 W.Va. 593, 596, 295 S.E.2d 680, 683 (1982)). In addressing the second prong *of Kucera* (legal duty to do that which petitioner seeks to compel), we observed that the Superintendent of Public Safety was statutorily charged with the mandatory duty to cause an investigation to be made of allegations against an officer.[16] As far as the final prong of *Kucera* (absence of other adequate remedy), we recognized that where substantial public policy is involved, such as public safety, relief in mandamus is appropriate unless there is another available remedy that is " 'equally beneficial, convenient and effective.' " *Skaff I*, 190 W.Va. at 508, 438 S.E.2d at 851 (quoting Syl. Pt. 2, in part, *Stowers v. Blackburn*, 141 W.Va. 328, 90 S.E.2d 277 (1955)).

After recognizing the existence of an implicit duty to promulgate formal, written investigative procedures as part of the mandatory duty to investigate police brutality claims, we proceeded to direct in *Skaff I* that such procedures be prepared consistent with our directives within 120 days. 190 W.Va. at 508–09, 438 S.E.2d at 851–52. Then, based on the language of West Virginia Code § 29–12–5(a) (1986) granting the Board of Risk the authority "to make rules and regulations governing its functions and operations," we required the Board of Risk, "to promulgate rules or regulations for State agencies covered by the State's liability insurance policy that will enable the Board to promptly identify potential liability claims against the State." *Skaff I*, 190 W.Va. at 505–06, 438 S.E.2d at 848–49, syl. pt. 5, in part.

The case before us presents grounds even more compelling than in *Skaff I* for issuing a writ of mandamus to compel the promulgation of a legislative rule because the Legislature expressly directed that such rule be created for the purpose of determining the "cost per day for each incarcerated inmate." W.Va.Code § 31–20–10(h). With regard to the standard for issuing a writ of mandamus in connection with the absent legislative rule, the first prong of *Kucera* is easily met in this case as there is no question that the Authority is statutorily imposed with the right to bring actions "in any court." W.Va.Code § 31–20–5(g); *see Kucera*, 153 W.Va. at 539, 170 S.E.2d at 367, syl. pt. 2. And with regard to the duty to create a legislative rule, the second prong of *Kucera* is established by statutory language requiring the promulgation of such rule. *See* W.Va.Code § 31–20–10(h). Likewise, the third prong, which requires the lack of another adequate remedy, may be fulfilled by the presence of an issue of substantial public policy, as we discussed in *Skaff I*, 190 W.Va. at 508, 438 S.E.2d at 851.

Without question, this Court's decision to issue a moulded writ of mandamus in *Skaff I* was galvanized by the concerns for public safety that were implicated in that matter. As we stated in discussing our decision to issue the writ, "[w]e believe that ensuring

---

**16.** *See* W.Va.Code § 15–2–21 (1977) (requiring that Superintendent "shall cause an investigation to be made").

that those entrusted by law to guard the public safety do not abuse their authority is a matter of 'substantial public policy[.]' " 190 W.Va. at 508, 438 S.E.2d at 851 (*quoting Smith*, 170 W.Va. at 597, 295 S.E.2d at 684). For reasons analogous to those presented in *Skaff I*, we are obliged to view the case before us as one that similarly invokes substantial public policy concerns and requires the issuance of a writ of mandamus to address certain pressing issues concerning the statutory funding mechanism for the regional jail system that are of statewide effect. That this state requires a functioning system of incarceration for the protection of its citizens is beyond dispute. Moreover, it cannot be questioned that the continuing operation of the regional jail system is a critical component of this state's ability to protect its citizenry by separately housing those individuals who have been charged and/or convicted with violating this state's criminal laws and thereby enforcing the criminal laws of this state. Consequently, we believe that the public safety concerns intrinsically entwined with the funding issues related to the regional jail system require us to address the relief required in the action before us through the use of a moulded writ of mandamus.

While, as this Court made clear in *Skaff II*, we cannot use the power of mandamus to prescribe the specific manner in which public officials shall act, we can and do identify the following issues that should be addressed when the legislative rules setting forth the criteria and procedures for setting the per diem rates are drafted. *See* 194 W.Va. 178, 182, 459 S.E.2d 921, 925 (1995). The procedural rule currently in effect does not include the additional five regional jails that have been constructed since the passage of the rule.[17] The rule now in effect establishes the per diem rate charge based on rated bed

capacity rather than the historical occupancy, which has the potential result of overcharging the counties. *See supra* n. 15. As the trial court's ruling suggests, there is language in West Virginia Code § 31–20–10a and elsewhere in the Act[18] that suggests that the per diem rate charges are to be separately calculated for each regional jail facility.[19] *See* W.Va.Code § 31–20–10a(b)(1). Guidance is also needed to address the tact adopted by the trial court that only "actual operational costs" can be recovered by the Authority. W.Va.Code § 31–20–10a(b)(2). While the Authority convincingly explained how it cannot wait until the end of a given fiscal year to make assessments for the usage of the regional jails, this terminology remains problematic and is in need of interpretation. *See supra* n. 9. Another area in which guidance would be useful is the issue of what types of costs qualify as those intended to be viewed as "indirect." Under the language of West Virginia Code § 31–20–10a(b)(1), the Authority is permitted to include both "direct and indirect" costs related to "operating and maintaining the regional jail" in preparing its operational expenditure schedule for "each regional jail." *Id.* Yet, the term "indirect" is not defined within the Act and to further complicate the issue there is language elsewhere that excepts "construction, acquisition or renovation" costs associated with the facilities from being included in setting the per diem rates. W.Va.Code § 31–20–10(h). An obvious question arises as to what then is the difference between a prohibited "renovation" cost versus an allowable "maintenance" cost. *Cf.* W.Va.Code §§ 31–20–10(h) to 31–20–10a(b)(1). Another issue identified by the trial court that requires legislative guidance concerns which entity, county or municipality, is responsible for inmates incarcerated following arrests by municipal law enforcement agencies.[20]

17. The procedural rule identifies rated bed capacity for those five regional jails that were in existence when the rule was adopted in 1994.

18. *See, e.g.,* W.Va.Code §§ 31–20–10(f)(5) (providing for requisition from separate accounts funded by counties under mandate of W.Va.Code § 31–20–10(h) to "pay for costs incurred at the regional jail facility at which each inmate was incarcerated").

19. As discussed above, the per diem rate structure is assessed to the counties on an across-the-board basis with the same per day cost assessed for each incarcerated inmate.

20. According to the trial court's order, the Authority takes the position that "municipalities are responsible for inmates processed through municipal court, but that counties are responsible for inmates processed through magistrate court."

Clearly, all of the identified issues, and more, are deserving of careful consideration in drafting a legislative rule that has been mandated since 1998. *See* W.Va.Code § 31–20–10(h). The continued reliance by the Authority on an outdated procedural rule cannot be permitted to continue. In our review of the record in this case, the current legislative scheme permits the Authority to unilaterally choose the criteria and procedures for per diem rate setting; to actually set the per diem rates; and to subsequently receive moneys based on this self-contained system with absolutely no review by the Legislature as a whole, or any other body, to assure that the proposed budgets of the respective regional jails are sufficient both to achieve efficiency as to operation and to fulfill the objectives of the regional jail system as a whole. Clearly, the case before us serves to demonstrate the existence of a pressing need for serious consideration and review of the legislative schema pursuant to which the regional jail system has been funding its operations.

### 3. Mandamus Relief for Assessed Per Diem Charges

#### a. Quorum Related Issues

As a precursor to addressing the Authority's entitlement to mandamus relief with regard to the assessed per diem charges for fiscal year 2005, we must address the trial court's decision to nullify the rate increase that resulted due to a vote of the Authority's board members at the February 10, 2004, meeting. Under West Virginia Code § 31–20–3, the Authority is governed by a board comprised of nine members, seven of whom are entitled to vote on matters brought be-

fore the board.[21] A quorum of the voting members, which is four,[22] is required for the board to take action under West Virginia Code § 31–20–4(b). In its findings, the trial court determined that only two voting members were present at the February 10, 2004, meeting of the board. While two additional individuals with colorable voting rights did participate in some fashion, one by telephone and one by "proxy," the trial court concluded that such participation was not within the meaning of the term "present" for purposes of requiring majority rule for any action taken by the board. *Id.* (providing that "[a] majority of the members of the board constitute a quorum, and a quorum must be present for the board to conduct business").

The Board's chairman, Dan Huck, participated by telephone and Donna Lipscomb attended the meeting in the stead of the Secretary of the Department of the Administration, Tom Sussman. Under the statute, the member slot given to the secretary of the department of the administration expressly permits this member to send "his or her designated representative" to board meetings. W.Va.Code § 31–20–3. The minutes of the February 10, 2004, meeting reflect that Ms. Lipscomb attended the meeting as the "proxy" for Mr. Sussman.

■ In deciding that neither Mr. Huck's participation nor the vote of Ms. Lipscomb was valid, the trial court cited the absence of any rules or regulations permitting members to "attend Jail Authority meetings by telephone" in Mr. Huck's case and in Ms. Lipscomb's case the existence of a procedural rule that bans proxy voting. In turn, we

**21.** Under the statute the following individuals comprise the Authority's board:

[T]he commissioner of the division of corrections; the director of the division of juvenile services; the secretary of the department of military affairs and public safety; the secretary of the department of administration, *or his or her designated representative;* three county officials appointed by the governor, no more than two of which may be of the same political party; and two citizens appointed by the governor to represent the areas of law and medicine. The commissioner of the division of corrections and the director of the division of juvenile services shall serve in an advisory

capacity and are not entitled to vote on matters coming before the authority. Members of the Legislature are not eligible to serve on the board.

W.Va.Code § 31–20–3 (emphasis supplied).

**22.** While we recognize that the statute defines a quorum in terms of the majority of the members of the board (which could be nine), the same statute sets forth as an initial premise that the "governing body of the authority shall consist of the voting members of the board" (which is seven). *See* W.Va.Code § 31–20–4(a), (b). If we have misinterpreted what the Legislature intends to be required for a quorum of the board, this can easily be corrected by statutory amendment.

take issue with both of these reasons. First, there is no question that Mr. Huck was actively involved in the board meeting at issue, only that his participation was telephonic in nature. Due to time and costs constraints, it has become customary for many governing bodies, even this one, to permit participation by telephone for voting purposes from time to time as circumstances may require. Consequently, we are reluctant to invalidate a specific vote at a meeting of the Authority solely because a procedural rule expressly permitting telephonic participation has not been formally adopted. W.Va.Code § 31-20-4(b). We do suggest, however, that when the rule changes that are mandated by this opinion come under consideration, it would be prudent to contemporaneously address this issue by means of either a procedural rule or a statutory amendment that expressly permits or prohibits participation by telephonic means.

As to Ms. Lipscomb, the procedural rule cited by the trial court does not, upon closer scrutiny, appear to support the exclusion of Ms. Lipscomb's participation in the meeting. What the procedural rule does is to prohibit proxy voting; it does not prohibit the selection of a designated representative to attend a meeting in the stead of the secretary of the department of the administration. If it did, it would be in direct contravention of the statutory language authorizing that particular department head to send "his or her designated representative." W.Va.Code § 31-20-3. What appears to have occurred here is that the use of the term "proxy" was inartfully inserted in the minutes of the questioned meeting when, in fact, Ms. Lipscomb was clearly intended, but perhaps not properly documented, to attend as the statutorily permitted "designated representative" for Mr. Sussman. Our review of the record in this case does not convince us that the intent of the procedural rule was violated. Immedi-

ately following the language of the procedural rule that prohibits proxy voting is express authorization for voting by a designated representative: "[D]uly qualified members of the Board, *or their designee as provided by section three, article twenty, chapter thirty-one of the code, are permitted to vote.*" W.Va.R. § 94-1-8.1 (emphasis supplied). The record suggests that Ms. Lipscomb was attending as the designee permitted by statute; she just did not have documentation reflecting that fact.[23] Again, while we can appreciate the technical issues that the trial court seized upon to invalidate the vote that took place at the board meeting in issue, we are reluctant to invalidate the vote in issue solely due to lack of guidance on what is required to qualify as a designated representative. We do, however, suggest that a procedural rule clarifying what is required to comply with the meaning of a "designated representative" under West Virginia Code § 31-20-3 specifically be adopted to address the requirements, such as the preparation of a document which indicates whether the authorization extended is continuing or limited to a particular meeting.

**b. Statutory Entitlement to Payment**

 Having rejected the trial court's reasoning on whether a quorum of voting members participated in the February 10, 2004, meeting, we proceed to examine whether the rate increase approved during that meeting is subject to enforcement. After deciding that the absence of a quorum stood as a bar to effectuating the per diem rate increase from $45.00 to $48.50, the trial court proceeded to essentially rewrite the criteria and procedures by which the per diem rate was to be set. Focusing on the term "actual operational costs," the trial court *sua sponte* proceeded to reduce the per diem rate adopted by the Authority to only $40.42[24]

---

**23.** Five months after the fact, a letter dated July 12, 2004, was prepared for the apparent purpose of retroactively authorizing Ms. Lipscomb as the designated representative for the secretary of the department of the administration. The trial court concluded that this letter was insufficient documentation to prove that Ms. Lipscomb was Mr. Sussman's designated representative at the February 10, 2004, meeting.

**24.** This figure was apparently selected based on the amount stipulated by the parties hereto "to be the actual operational cost per inmate day for the Western Regional Jail for fiscal year 2005." While the trial court makes this finding and indeed the stipulation contained in the record sets forth this figure, we have been unable to verify this amount due to the absence of supporting documentation or calculations.

and directed that this would be the rate for purposes of determining what amount the Commission owed to the Authority from July 1, 2004, on for fiscal year 2005.

We fully appreciate the dire financial circumstances that led the Commission to challenge the $48.50 per diem rate approved by the Authority at the February 10, 2004, meeting, and we take judicial notice of the fact that escalating regional jail costs have effectively crippled the counties of this state with regard to their respective budgetary decisions. We find our collective judicial hands to be tied, however, as far as upholding the reduction in payments granted by the trial court. The combination of an insufficient record to support the actions taken by the trial court combined with the statutory mandate that requires the Commission's payment of amounts assessed by the Authority for the incarceration of inmates at the regional jails does not permit this judicial body to approve the *sua sponte* reduction in rates adopted by the trial court.

While we are greatly troubled by the apparent lack of documentation submitted at the February 10, 2004, meeting of the board to support the increase in the per diem rate, at the same time we have no basis from which to conclude that the increased rate was not justified in terms of the still valid criteria and procedures for setting such rate.[25] The bottom line is that we cannot independently confirm that $48.50 is the per diem rate required by performing calculations suggested by the operational expenditure schedules included in the record of this case. *See* W.Va.Code § 31–20–10a(b)(1). But neither can we definitively conclude that such rate is not justified by the actual or projected expenditure schedules. Consequently, we are constrained to conclude that the record before us does not justify the unilateral rate reduction implemented by the trial court or the unilateral change in the methodology employed to arrive at the per diem rate.

Given this Court's duty to uphold the laws of this state which includes the enactments of our Legislature, we are similarly constrained to recognize the mandatory language directing that the counties "shall pay" for the "costs of operating the regional jail facilities of this state to maintain each inmate" as well as the statutory language that imposes responsibility on the counties for "costs incurred by the Authority for housing and maintaining inmates in its facilities." W.Va.Code §§ 31–20–10(h); 31–20–10a(c). As we stated in syllabus point one of *Nelson v. West Virginia Public Employees Insurance Board,* 171 W.Va. 445, 300 S.E.2d 86 (1982): "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Accordingly, we conclude that the statutory provision imposing mandatory payment obligations on the Commission for inmates housed in the regional jail is clearly subject to enforcement. Furthermore, the trial court was without the authority to reduce the amount of assessments made by the Authority in reliance on the mandatory payment provisions set forth in West Virginia Code § 31–21–10(h). Accordingly, the Commission is required by statute to remit payment to the Authority for those amounts assessed for per diem payments in connection with fiscal year 2005. Insofar as the trial court improperly reduced the per diem rate pursuant to which the Commission was obligated to pay the Authority for fiscal year 2005, the Commission remains responsible for the amounts as originally assessed for such period.

Having concluded that the trial court exceeded its authority in reducing the per diem rate and in effectively rewriting the criteria and procedures to be relied upon in setting such rate, we recognize the unenviable position the Commission finds itself in—the proverbial position of being between a rock and a hard spot—given the limited funds it has to apportion between the competing and equally deserving interests vying for such funds.[26]

---

**25.** Due to the utter lack of documentation submitted to support such a rate increase as reflected by the minutes of the February 10, 2004, meeting, we cannot ascertain whether the Authority adhered to the criteria and procedures set forth in the procedural rule in arriving at the requested and ultimately approved per diem rate of $48.50. *See* W.Va.R. § 94–3–5.

**26.** The Commission states in its brief: "There is no dispute that the Commission had no addition-

That this matter is urgently deserving of serious attention from the Legislature cannot be disputed. When asked to use its power of mandamus to enforce a statute charging counties with contributing to a general relief fund for the poor,[27] this Court observed with great foresight in *Kenny* that "[b]oth the Legislature and state officials should refrain from imposing upon county courts, and other fiscal bodies, greater burdens than their revenues justify." 124 W.Va. at 531, 21 S.E.2d at 390. Sadly, the situation foreshadowed in that 1942 decision has come home to roost. The Legislature has imposed upon the county courts "greater burdens than their revenues justify." *Id.* That the counties are in need of some form of relief from fully shouldering the costs of the regional jails seems clear. Notwithstanding our recognition of these serious funding-related concerns, the Commission remains obligated to pay those assessed per diem charges that have accrued since 2005 which remain unpaid.

### C. Relief Granted

In consideration of the cumulative discussion above, we grant a writ of mandamus moulded as follows:

1. The Authority shall promptly meet and formulate a proposed legislative rule as provided for by West Virginia Code § 31–20–10(h) for review by the Legislature and faithfully pursue the promulgation of such a rule.

2. The proposed legislative rule should specifically address whether the per diem rate charge authorized by West Virginia Code § 31–20–10(h) is a uniform or distinct rate with regard to each of the regional jails.

3. The proposed legislative rule should address whether the per diem rate calculation is to be based upon the rated bed capacity of each regional jail or the historical population of such facility.

4. In the event the issue of a per diem rate increase arises before the adoption of the contemplated legislative rule, full documentation should be distributed to the board members to enable the membership to assess whether the rate increase has been calculated in accordance with existing criteria and procedures adopted for setting such rate.[28]

5. The Authority should promptly consider and promulgate a procedural rule that addresses the issue of telephonic participation at its board meetings and further addresses the manner in which the selection of a statutorily permitted designated representative shall be duly authorized.

Having set forth the terms of this moulded writ, we stress that nothing in this writ shall be construed as limiting the plenary powers of the Legislature to modify Article 20, Chapter 31 of the West Virginia Code of 1931, or to achieve by legislation all or any part of the matters addressed through the issuance of this moulded writ. Clearly, the Legislature may choose to address legislation directed at the issues included in the writ and may certainly elect to modify the laws under discussion in any other manner deemed appropriate within the ambit of its constitutionally granted powers. It remains, however, the clear duty of the Authority to promptly and fully comply with this writ as to any matters not addressed specifically by the Legislature and to act without delay despite the possibility of forthcoming legislative action concerning the issues raised herein.

Writ granted as moulded.

STARCHER, J., concurring:

(Filed November 21, 2007)

I reluctantly concur with the well-reasoned majority opinion and the relief awarded therein. I write separately to point to several related issues that the Legislature should

---

al levying authority nor any means of raising additional revenue with the exception of liquidating county property."

**27.** This Court granted the requested relief in mandamus in that case only after determining that the contribution at issue could be effected without sacrificing any mandatory functions of the county governments or creating an overdraft

in the general county fund. *See Kenny,* 124 W.Va. at 532–33, 21 S.E.2d at 391.

**28.** The documentation that this Court anticipates would be distributed would clearly set forth the formula by which the rate is determined and supply sufficient financial information to fully support the requested increase.

take up—along with looking at the daily "room rate" paid to the Regional Jail Authority by our counties' taxpayers.

First, the creation and history of West Virginia's Regional Jail "Authority" is an unfortunate example of an anti-democratic trend in American government. The great innovator in this area was the late Robert Moses, who masterminded a system of transportation "Authorities" (for building bridges and highways) in New York State that were answerable to no one—but controlled billions of public dollars. Using the archaic purported prohibition against public borrowing as an excuse for their creation, these "Authorities" (which are in many ways like the Regional Jail Authority) can become laws unto themselves, orchestrating multi-million-dollar deals that benefit powerful political forces—but effectively outside the control of local and state elected officials, and ultimately, the voters.

No wonder democratically-elected West Virginia county governments chafe in their relationship with the Regional Jail Authority—their only "right" is the right to "pay up" as much as the Authority says![1] The Court's opinion clearly points out that the democratically-elected Legislature has come close to entirely abdicating its duty to see that the RJA is both funded and operated in an efficient and fair fashion. There should be no "blank checks" for the RJA. County commissions cannot continue to send to the RJA signed checks with blanks in the "amount lines" that are to be filled in by RJA administrators.

The Legislature had better step up and restore some balance—or taxpayers will rightfully revolt! It was not long ago that one of our more rural counties could not meet its payroll for county employees because of excessive monies it had to pay to the RJA.

Second, it should be noted that West Virginia has absolutely no need for the number of jail and prison beds it has now (much less an increase). Crime rates are down in our state. Most new admissions to jails and prisons are for nonviolent offenses. And, a substantial portion of jail and prison inmates are there because of their untreated mental illness.

The result is that our regional jails are overcrowded, but the truth is that for the same or less money, many of the current inmates could be safely punished or safely managed (with intensive supervision) in the community—punishment that should be weighed heavily with public service work, like cleaning highways, parks, streams, etc. Sadly, too many prosecutors seek and judges impose long prison and jail sentences out of fear, anger, and re-election concerns—not common sense or a compelling concern for public safety. And the bottom line is again that county commissions (with ordinary citizens' tax monies) have to "pay up"—due to sentencing decisions that the commissions did not make. This situation *cries out* for Legislative attention.

Third, let's not forget that *when it comes to locking people up, race matters.* The percent of jail and prison inmates who are African American is hugely higher than the African American percentage in West Virginia's population. And for the same offenses, black West Virginians receive much harsher sentences.[2] To *not* recognize this is to turn a

1. I very much respect the hard work and integrity of the people who work in our regional jails, all too often for very modest wages. I believe these dedicated public employees should be paid well to protect us from (and try to rehabilitate) the dangerous offenders whom we cannot safely punish and manage in our communities.

2. Several years ago this Court formed a Task Force to Study Perceived Racial Disparity in the Juvenile Justice System in response to a Petition for Promulgation of Rules and Standards to Ensure Equal Treatment in the West Virginia Juvenile Justice System. The Petition was filed by several prominent West Virginia lawyers, including West Virginia University College of Law Professors Robert M. Bastress and former Supreme Court Justice Franklin D. Cleckley, and was based, in part, on a 2001 report titled Minority Youth and Juvenile Justice in West Virginia. The report that was funded by the Board of Church and Society, West Virginia Annual Conference, United Methodist Church.

The Task Force met numerous times and considered its assigned charge, but no report has yet to be produced by the Court. Inasmuch as a majority of this Court voted to deny me my scheduled rotation as Chief Justice for the year 2007, I have been unable to help bring this Task

blind eye to the truth. The Legislature should take a hard look at this situation, too.

Having made these points, I reluctantly concur.

Force's work to a resolution. Sometimes, and for some people, the continuing problems of the color line in America are more easily "swept under the rug" than confronted. But we all pay a price for this mistake.